**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| PAUL LOUIS ADKINS, JR., | ) |
| Plaintiff, | ) |
| v. | ) CIVIL NO. 3:10CV60 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] Plaintiff, Paul Louis Adkins, Jr., seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his application for Supplemental Security Income payments ("SSI"). The Commissioner's final decision is based on a finding by an Administrative Law Judge ("ALJ") that Plaintiff was not disabled as defined by the Social Security Act ("the Act") and applicable regulations.

For the reasons discussed herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (docket no. 9) and motion to remand (docket no. 10) be DENIED; that

---

[1] The administrative record in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Defendant's motion for summary judgment (docket no. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed for SSI on November 16, 2007, claiming disability due to bipolar disorder and manic depression, with an alleged onset date of June 30, 2006. (R. at 84, 106-07.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 49-53; 57-58.) On May 29, 2009, accompanied by counsel, Plaintiff testified before an ALJ. (R. at 20-46.) On August 6, 2009, the ALJ denied Plaintiff's application, finding that he was not disabled under the Act where, based on his age, education, work experience and residual functional capacity, there are jobs he could perform which exist in significant numbers in the national economy. (R. at 11-19.) The Appeals Council subsequently denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1-5.)

## II. QUESTION PRESENTED

Is the Commissioner's decision that Plaintiff is not entitled to benefits supported by substantial evidence on the record and the application of the correct legal standard?

## III. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government–the Disability Determination Services (DDS), a division of the Virginia Department of Rehabilitative Services–under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; see also § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

2

record and whether the proper legal standards were applied in evaluating the evidence. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971); Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'" Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Craig, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Breeden v. Weinberger, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; Mastro, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were

applied, and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" (SGA).[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. Id. If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); see also 20 C.F.R.404.1520(c). In order to qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

return to his past relevant work[4] based on an assessment of the claimant's residual functional capacity (RFC)[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. Id. However, if the claimant cannot perform his past work, the burden shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience, and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents *all* of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." Id. If the ALJ finds that the claimant is not

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. Id. (footnote omitted).

capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## IV. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset of his disability. (R. at 13.) At steps two and three, the ALJ found that Plaintiff had the severe impairments of an affective disorder and an anxiety disorder, but that these impairments did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award of benefits at that stage. (R. at 13-14.) The ALJ next determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but that he was limited to simple, unskilled work in positions that do not require contact with the general public. (R. at 15-17.)

The ALJ then determined at step four of the analysis that Plaintiff did not have any past relevant work. (R. at 17.) At step five, after considering Plaintiff's age, education, work experience, and RFC, the ALJ nevertheless found that there are other occupations which exist in significant numbers in the national economy that Plaintiff could perform. (R. at 18.) Specifically, the ALJ found that Plaintiff's nonexertional limitations had little or no effect on the occupational base of unskilled work at all exertional levels. (R. at 18.) Accordingly, the ALJ concluded that Plaintiff was not disabled and was employable such that he was not entitled to benefits. (R. at 18.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mot. for Summ. J.) In support of his position, Plaintiff argues that: (1) the ALJ failed to obtain testimony from a VE to determine whether there were jobs Plaintiff could perform; (2) the ALJ

6

failed to adequately consider Plaintiff's obesity; (3) the ALJ improperly relied upon inadmissible hearsay in concluding that Plaintiff was not disabled; and (4) the ALJ improperly evaluated Plaintiff's credibility. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 3-7.) Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") at 9-18.)

> A. **The ALJ was not required to elicit testimony from a VE before determining that there were jobs which existed in significant numbers in the national economy that Plaintiff could perform.**

Plaintiff argues that because he suffered exclusively from non-exertional impairments, vocational testimony was required. (Pl.'s Mem. at 3.) However, it appears, rather, that Plaintiff is challenging the ALJ's RFC assessment because the ALJ did not include further limitations or restrictions on Plaintiff's work capabilities. Though Plaintiff properly notes that the ALJ is required to make detailed findings on a function-by-function basis of many different variables of his mental impairment (Pl.'s Mem. at 4, see SSR 96-8p), Plaintiff incorrectly asserts that the ALJ must analyze those functions in such a way as was done by the consulting examiners (Drs. Wade, Tipton, and Saxby). (Pl.'s Mem. at 4.)[6]

---

[6] Medical experts consider specific abilities a claimant is capable of performing in evaluating the evidence. Their assessments are segregated into three sections, the first being "a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment," and the third of which is a mental RFC determination in a narrative format. https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060. Adjudicators are then to take the physician's RFC analysis in section III and decide what significance the elements discussed have in terms of the claimant's ability to meet the mental demands of past or other work. https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010. The adjudicator is required to use his own "informed professional judgment" before making his own RFC determination. Id.
.

The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but that he was limited to simple, unskilled work in positions that do not require contact with the general public. (R. at 15-17.) SSR 96-8p states that the ALJ's RFC analysis should identify the functions listed in 20 C.F.R. § 416.945, namely, understanding, remembering, and carrying out simple instructions, and responding appropriately to supervision, coworkers, and work pressure in a work setting. Such functions were addressed in the ALJ's opinion, but the ALJ ultimately found that they were not so severe as to necessitate a functional limitation on his work capabilities, other than a lack of contact with the general public. (R. at 16-17.)

Though Plaintiff argues that the ALJ did not make a proper mental finding, there is substantial evidence supporting the ALJ's conclusion. The ALJ concluded that Plaintiff suffered from no exertional limitations, but nonexertionally he was limited to simple, unskilled work in positions that do not require contact with the general public. (Pl.'s Mem. at 4, R. at 15.) In arriving at his conclusion, the ALJ considered Plaintiff's testimony and statements, as well as the medical evidence of record. (R. at 15-17.) The ALJ acknowledged that Plaintiff suffered from the severe impairments of an affective disorder and an anxiety disorder, yet he concluded that the impairments did not limit Plaintiff's ability to function to the degree alleged. (R. at 13, 17.) The ALJ noted Plaintiff's treatment, stating that it was conservative with improvement over time. (R. at 17.) The ALJ also noted Plaintiff's "flagrant exaggeration" of his symptomology upon objective testing, which called into serious question the credibility of his allegations. (R. at 17, 268-72.) Further, Plaintiff's activities of daily living, including shopping, driving, cooking, cleaning, and some socialization with his neighbor and girlfriend's brother, belied his allegations of an inability to function. (R. at 17.) The ALJ also weighed the opinions of state agency

8

consultants, finding that they were entitled to great weight as they were well-supported and consistent with the medical evidence as a while. (R. at 17.) The state agency consultants found that while Plaintiff had difficulty working with or near other employees without being severely distracted by them, he could work cooperatively with others without distracting them or behaving in an unacceptable manner. (R. at 17, 209-29, 279.) The consultants further opined that Plaintiff's basic memory processes were intact and he was able to make simple decisions. Id.

The ALJ also assigned probative weight to the opinion of Dr. Tipton, who consulted with Plaintiff, as Dr. Tipton's opinion was essentially consistent with the medical evidence as a whole. (R. at 17, 201-07.) Dr. Tipton opined that Plaintiff was capable of maintaining attention for at least brief periods of time, though his ability to do so would likely be affected when he was under stress; he would have difficultly with tasks requiring complex attention; Plaintiff showed some improvement, but it was reasonable to expect more improvement because of his regulated medications; he was intellectually capable of performing simple, routine, repetitive tasks; he would likely have some difficulty at times maintaining attendance, particularly if his job involved working with others; he would likely have trouble working with the general public and in close proximity with others; there were no indications of psychotic symptoms that would cause interruptions in a work routine; and his anger management control could interfere with his ability to accept instructions from a supervisor at times. (R. at 201-07.)

Plaintiff testified that he never had a job he was not terminated from as a result of his anger and temper issues. (R. at 35-36.) Plaintiff has held numerous jobs since 1985, but he did not allege any disability until 2006. (R. at 84, 90.) Dr. Tipton opined that Plaintiff's anger

9

management control could occasionally interfere with his ability to accept instructions from a supervisor. (R. at 206.) However, Dr. Tipton also opined that Plaintiff appeared to be demonstrating improvement, and as his medication is regulated it would be reasonable to expect even greater improvement. (R. at 206.) The medical evidence of record also indicates some improvement. For example, though Plaintiff reported that he was still angry and irritable at times, especially in the evening hours, he was tolerating his medications, losing weight, monitoring his diet, and he had even began a part-time job delivering newspapers. (R. at 264-66, 282-86.) In July of 2008, Plaintiff reported that he did not want to attend an anger management group, yet he was continuing with individual therapy. (R. at 286.) In September of 2008, Plaintiff reported that his irritability was worse when he was not using medication. (R. at 284.) In October of 2008, it was noted that Plaintiff's mood and temper were improved, he was sleeping well, tolerating his medications, and working part-time. (R. at 283.) In December of 2008, the evidence indicates that Plaintiff was irritable at times, though tolerating his medications and still working 36-37 hours a week delivering newspapers. (R. at 282.) There are no records concerning his mental impairments after December of 2008.

Though the ALJ afforded little probative weight to Dr. Wade's opinion because it was not well-defined, the ALJ nevertheless noted that the opinion was supported, at least in part, by invalid indicators of mental functional ability. (R. at 17, 268-72.) Dr. Wade conducted several mental tests and concluded that suspicious application of effort by Plaintiff was almost certain, and that he, Dr. Wade, was unable to offer a diagnosis because of the questionable validity of the test data. (R. at268-72.) Indeed, Plaintiff's performance on one test was "far below that expected from persons with verified moderate to severe brain damage," which suggested that

10

Plaintiff had made a systematic effort to exaggerate his symptoms. (R. at 271.)

Relying on the medical evidence and physicians' opinions, as well as Plaintiff's admitted daily activities and his "less than credible" testimony, the ALJ still allowed for the nonexertional limitation of not working or having contact with the general public. (R. at 17.) Such a limitation is consistent with Plaintiff's admitted fear of being around others and the various physicians' opinions that Plaintiff suffered from agoraphobia[7], though without a history of panic attacks. (R. at 206, 224.) The ALJ otherwise limited Plaintiff to simple, unskilled work. By definition, "unskilled" work is:

> work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time...For example, we consider jobs unskilled if the primary duties are handling, feeling and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

20 C.F.R. § 416.968(a), SSR 83-10. Though Plaintiff argues that the limitation of "unskilled" work is markedly insufficient, such a limitation is consistent with the physicians' opinions of record. Dr. Saxby, for example, found one "marked" limitation during Plaintiff's psychiatric evaluation, namely, a markedly limited ability to interact appropriately with the general public. (R. at 227.) The ALJ accounted for such a limitation, and further, unskilled occupations "ordinarily involved <u>dealing primarily with objects, rather than with data or people</u>, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a

---

[7] Agoraphobia is the "intense, irrational fear of open spaces, characterized by marked fear of venturing out alone or of being in public places where escape would be difficult or help might be unavailable." <u>Dorland's Illustrated Medical Dictionary</u> 41 (31st ed. 2007).

11

sustained basis." SSR 85-15 (emphasis added). The regulation further notes that "in the world of work, losses of intellectual and emotional capacities are generally more serious when the job is complex." Id. Though Dr. Saxby opined that Plaintiff would suffer moderate difficulties in maintaining social function and concentration, persistence, or pace, he still concluded that Plaintiff would be able to meet the basic mental demands of competitive work on a sustained basis. (R. at 221, 228.) Dr. Tipton also concluded that Plaintiff was intellectually capable of performing simple, routine, repetitive tasks. (R. at 206.)

Once an ALJ determines a claimant's RFC, he may use the Grids to determine the claimant's level of disability and potential for employment. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). However, if a rule directs a finding of "not disabled" based on the strength requirement (i.e., the claimant is limited to light work and meets one of the categories in rule 202.10), then the ALJ cannot utilize the Grids; instead, a VE must be utilized to take into account the effects of the claimant's nonexertional and exertional limitations and the claimant's RFC to determine whether there are jobs existing in significant numbers in the national economy that the claimant can perform. Walker, 889 F.2d 49-50. It is important to note, however, that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." Walker, 889 F.2d at 49 (citing Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983)). The ALJ must inquire whether the nonexertional condition affects the claimant's RFC to perform work of which the claimant is exertionally capable. Id.

With regard to Plaintiff's limitation to simple, unskilled work entailing only limited contact with the general public, the ALJ properly found that Plaintiff had no limitations on his ability to understand, remember, and carry out simple job instructions; nor did a limited contact

with the public constitute a significant loss of ability to respond appropriately to usual work situations. (R. at 19.) The "basic mental demands" of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. SSR 85-15. A <u>substantial</u> loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. <u>Id.</u> (emphasis added). While there may be evidence suggesting a somewhat impaired ability to respond appropriately to supervision, coworkers, and usual work situations, there is substantial evidence supporting the ALJ's conclusion that Plaintiff's nonexertional limitations do not significantly erode the occupational base of unskilled work. (R. at 18.)

In light of such evidence, as well as the entirety of Plaintiff's record, the ALJ only placed one nonexertional limitation on Plaintiff's RFC, which, as noted, has little if any impact on the occupational base of simple unskilled work. Therefore, with the given RFC, the ALJ was not required to utilize the testimony of a VE, as Plaintiff's nonexertional limitation did not rise to the level of impairment so as to preclude reliance on the Grids. Accordingly, it is the Court's recommendation that the ALJ's decision in this regard is supported by substantial evidence and application of the correct legal standards, and should therefore be affirmed.

   **B.**  **The ALJ properly evaluated Plaintiff's impairments.**

Plaintiff further argues that the ALJ failed to consider his obesity in connection with his mental impairments, and because of such a failure, the findings regarding Plaintiff's mental impairments are insufficient. (Pl.'s Mem. at 5.) Plaintiff also argues that the ALJ did not consider Plaintiff's IQ scores as indicative of a psychological impairment. (Pl.'s Mem. at 5.)

13

Contrary to Plaintiff's assertion, however, the ALJ did address Plaintiff's obesity by stating:

> while the medical evidence of record includes treatment for obesity, degenerative disc disease of the cervical spine, hypertension, hyperlipidemia, refractive amblyopia of the right eye, and gastroesophageal reflux disease, these conditions, <u>either alone or in combination</u>, have no more than a minimal effect on the claimant's ability to function and are not 'severe.'

(R. at 13, emphasis added.) It is therefore clear that the ALJ considered Plaintiff's obesity and his conclusion regarding such is supported by substantial evidence. For example, Plaintiff never alleged his obesity was disabling.[8] Furthermore, Plaintiff failed to note his weight as a factor to be considered during the hearing before the ALJ, in which both he and his counsel were given more than sufficient opportunity to supplement the record. (See R. at 20-46.) Treatment records also reflect that during the relevant period, Plaintiff had lost weight, was exercising, and monitoring his diet. (R. at 169-76, 195, 205, 286.) Further, DDS physicians opined that while the medical evidence revealed obesity as a physical impairment, Plaintiff did not allege any physical limitations, and the medical evidence demonstrated that the conditions were "non-severe." (R. at 248.) Dr. Tony Constant, M.D., also opined that Plaintiff's obesity was "nonsevere," an assessment later confirmed by Dr. Robert Chaplin, another state agency physician. (R. at 249, 278.) While Plaintiff's BMI (body mass index) may be as high as fifty (R.

---

[8] An ALJ has the duty to develop the record and to consider a claimant's medical history and alleged sources of impairment; however, the ALJ is not required to assume or surmise that a circumstance or condition exists without the plaintiff first alleging that the condition or impairment is a source or cause of an alleged disability. To determine otherwise would require an ALJ to consider every detail of a claimant's medical record without a particular issue being raised, and draw conclusions about potential impairments that may not be relevant to the pending disability claim. Such an analysis would overly burden the ALJ and render the system ineffective. While the ALJ has an affirmative duty to inquire into a plaintiff's condition and impairments, it is the claimant's responsibility to at least indicate which impairments allegedly caused or contributed to an alleged disability.

at 169), and may even be categorized as "extreme" (SSR 02-1p), "there is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment." SSR 02-1p. Neither do descriptive terms for levels of obesity, such as "extreme," establish whether obesity is or is not a "severe" impairment for disability program purposes. SSR 02-1p. Therefore, there is substantial evidence supporting the ALJ's decision that Plaintiff's obesity was not a severe impairment.

While Plaintiff argues that his IQ score should be considered a nonexertional impairment, he fails to recognize that an examining physician found him intellectually capable of performing simple, routine, repetitive tasks, which is indicative of an ability to perform simple, unskilled work. (R. at 206.) Plaintiff also appears to ask the Court to consider Dr. Wade's opinion, which stated that Plaintiff had an IQ of 77. (R. at 270.) However, as already noted, the ALJ assigned such report little probative weight because of Dr. Wade's inability to offer a well-defined opinion as a result of Plaintiff's apparent "suspicious application of effort" during testing. (R. at 17, 271.) Plaintiff's allegations of special education and a reported inability to read as evidence of an impairment are unpersuasive, as Plaintiff also reported at one point that he did not attend special education classes and that he could read and understand English, as well as write more than his own name in English. (Pl.'s Mem. at 5, R. at 106, 111.)

Accordingly, it is the Court's recommendation that the ALJ's decision in this regard be affirmed as well, as it is supported by substantial evidence and application of the correct legal standard.

C. **Plaintiff's hearsay challenge lacks merit.**

Plaintiff argues that a DDS physician's report utilized inadmissible hearsay from

Plaintiff's therapist to opine that Plaintiff was not disabled. (Pl.'s Mem. at 6.) At the same time, Plaintiff concedes that the ALJ did not rely upon such report to deny his claim. Id.

Notwithstanding Plaintiff's concession that the ALJ did not rely on the DDS physician's report in denying benefits, Plaintiff's claim otherwise lacks merit. Plaintiff's assertion that unsigned reports of contact are inadmissible is incorrect,[9] and irrelevant, as the ALJ determines the admissibility of evidence and is not bound by the Federal Rules of Evidence. 20 C.F.R. § 498.217(b). Because the ALJ did not rely on the evidence exclusively in making his decision – in fact he did not even mention the report from Plaintiff's therapist – the ALJ did not act improperly.

### D. The ALJ properly evaluated Plaintiff's credibility.

Plaintiff argues that the ALJ did not properly consider his credibility as required by 96-7p. (Pl.'s Mem. at 6.) Specifically, he contends that the ALJ failed to consider Plaintiff's past work history and the testimony from one Sharon Brooks, who offered testimony as to Plaintiff's anger and temper issues, his previous employment, and his improvement with treatment and medication regulation. (Pl.'s Mem. at 6, R. at 42-45.) Plaintiff also argues that his global assessment of functioning ("GAF") score of fifty[10] is indicative of an inability to maintain

---

[9] Plaintiff cites Hooper v. Heckler in support of his allegation. 152 F.2d 83, 85 n.2 (4th Cir. 1985). However, the Fourth Circuit did not declare that unsigned reports were per se inadmissible in its decision. The Court simply held that while an unsigned report was admitted into evidence, without objection, "the Secretary's practice of obtaining such evidence is of questionable propriety." Id.

[10] A GAF score between 41 and 50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. http://www.bsu.edu/csh/ssrc/media/pdf/gafpage.pdf. A GAF score between 51 and 60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. Id.

employment. (Pl.'s Mem. at 67, R. at 207.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(5)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. Craig v. Charter, 76 F.3d 585, 594 (4th Cir. 1996); see also SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. Id.; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. Craig, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; see also SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. Craig, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. See Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). The Court of Appeals for the

Fourth Circuit (as the immediate controlling appellate authority for this Court) has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" Id. (quoting NLRB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NLRB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. See Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591.

In making his credibility determination, the ALJ discussed Plaintiff's testimony and written statements, and specifically noted that Plaintiff alleged he suffered from a bipolar disorder which prevented him from maintaining employment due to his inability to interact with others and his fear of open spaces. (R. at 15.) However, the ALJ found that claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible. (R. at 15.) Such a conclusion is supported by substantial evidence. For example, Plaintiff testified that he drives, grocery shops, cooks, does light cleaning, provides for his own personal care, cares for his son, and enjoys socializing with his neighbor and girlfriend's brother. (R. at 26, 30-31, 120-27.) He also testified that his medication regimen and counseling sessions

aided him. (R. at 33.) Notes from his therapy sessions indicated improvement as well, as noted earlier. (R. at 17, 264-66, 282-86.) Though Dr. Tipton rated Plaintiff's GAF at fifty, he also opined that Plaintiff was intellectually capable of performing simple, routine, repetitive tasks, and that his impairments were likely to improve as his medications were regulated. (R. at 206.) While Dr. Wade was unable to offer a well-defined opinion after a neuropsychological evaluation of Plaintiff, he suspected, as noted earlier, that Plaintiff was exaggerating his symptoms, which adversely affected the validity of the test data. (R. at 268-72.) While the ALJ only assessed the opinion little probative weight because of the invalid testing, he nevertheless relied on the report in part in finding Plaintiff less than fully credible. (R. at 16-17.) Specifically, the ALJ stated that Plaintiff's "flagrant exaggeration of his symptomology upon objective testing...calls into serious question the credibility of his allegations." (R. at 17.) The ALJ further noted that while Plaintiff suffered from multiple mental health disorders, his treatment had been conservative with improvement over time. (R. at 17.) The ALJ also noted that Plaintiff's extensive activities of daily living belied his allegations of inability to function. (R. at 17.)

Though Plaintiff argues that the ALJ's failure to discuss Sharon Brooks' testimony is improper, it is important to note that her testimony was largely duplicative of Plaintiff's, and in any event, this Court must give great deference to the ALJ's credibility determination. Here, the ALJ considered Plaintiff's statements and reports, including reports of his work history, Plaintiff's activities of daily living, opinions of examining and non-examining physicians, and treatment notes from Plaintiff's therapists and physicians. Because he considered all the evidence of record, and his decision is supported by substantial evidence, it is the Court's

recommendation that the ALJ's decision be affirmed in its entirety.

## V. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment (docket no. 9) and motion to remand (docket no. 10) be DENIED; that Defendant's motion for summary judgment (docket no. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/
DENNIS W. DOHNAL
UNITED STATES MAGISTRATE JUDGE

Date: September 28, 2010
Richmond, Virginia